## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

SHELBI HINDEL, *et al.*,                    *

      Plaintiffs,                    *

v.                                          *          Civil Action No. 2:15-cv-3061

JON A. HUSTED,                              *

      Defendant.                     *

  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

## MOTION FOR PERMANENT INJUNCTION

Plaintiffs Shelbi Hindel, Barbara Pierce, Marianne Denning, and the National Federation of the Blind, Inc. ("NFB") (collectively "Plaintiffs"), by their undersigned counsel, pursuant to 42 U.S.C. § 12188(a), move the Court to issue a permanent injunction against Defendant Jon A. Husted, in his official capacity as Ohio Secretary of State, prohibiting Mr. Husted from violating Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12213, and requiring him to: (1) make his website, http://www.sos.state.oh.us, accessible to Plaintiffs, such that the website offers Plaintiffs all of the same information and the same transactions, with substantially equivalent ease of use, by March 3, 2017 (60 days before the May 2, 2017 primary election); and (2) develop and implement policies and procedures to ensure that his website remains accessible after March 3, 2017.  The grounds for this motion are set forth in the attached Memorandum of Law and accompanying exhibits.

WHEREFORE, Plaintiffs request that their Motion be granted and that the Court issue a permanent injunction against Defendant.

Respectfully submitted,


       /s/

Jason Boylan (0082409), Trial Attorney
Kristen Henry (0082382)
DISABILITY RIGHTS OHIO
Ohio Disability Rights Law and Policy Center, Inc.
50 W. Broad St., Suite 1400
Columbus, OH 43215
Tel: (614) 466-7264
Fax: (614) 644-1888
jboylan@disabilityrightsohio.org
khenry@disabilityrightsohio.org

Daniel F. Goldstein (admitted *pro hac vice*)
Jessica P. Weber (admitted *pro hac vice*)
BROWN, GOLDSTEIN & LEVY LLP
120 E. Baltimore Street, Suite 1700
Baltimore, Maryland 21202
Tel: (410) 962-1030
Fax: (410) 385-0869
dfg@browngold.com
jweber@browngold.com

*Counsel for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

SHELBI HINDEL, *et al.*,                    *

      Plaintiffs,                          *

v.                                          *          Civil Action No. 2:15-cv-3061

JON A. HUSTED,                              *

      Defendant.                           *

---

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PERMANENT INJUNCTION

---

Daniel F. Goldstein (admitted *pro hac vice*)
Jessica P. Weber (admitted *pro hac vice*)
BROWN, GOLDSTEIN & LEVY, LLP
120 E. Baltimore Street, Suite 1700
Baltimore, Maryland 21202
Tel: (410) 962-1030
Fax: (410) 385-0869
dfg@browngold.com
jweber@browngold.com

Jason C. Boylan (0082409), Trial Attorney
Kristen Henry (0082382)
Disability Rights Ohio
Ohio Disability Rights Law and Policy
Center, Inc.
50 W. Broad St., Suite 1400
Columbus, OH 43215
Tel: (614) 466-7264
Fax: (614) 644-1888
jboylan@disabilityrightsohio.org
khenry@disabilityrightsohio.org

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................................ii

STATEMENT OF FACTS .......................................................................................................... 2

    I.   Barriers to Website Access .......................................................................................... 3

    II.  Lack of Policies and Procedures to Ensure Website Accessibility...................................... 9

LEGAL STANDARD.................................................................................................................. 11

ARGUMENT .............................................................................................................................. 11

    I.   By denying Plaintiffs an equal opportunity to access his website, Secretary Husted
         violates Title II of the ADA ....................................................................................... 11

    II.  Plaintiffs satisfy all of the criteria for granting a permanent injunction ......................... 15

         A.  Plaintiffs have suffered and will continue to suffer an irreparable injury if Secretary
              Husted continues to violate their federal civil right to equal opportunity ................. 15

         B.  Remedies available at law, such as monetary damages, are inadequate to
              compensate for Plaintiffs' injury ............................................................................. 16

         C.  The balance of hardships tips decidedly in favor of granting Plaintiffs' requested
              equitable relief ...................................................................................................... 16

         D.  A permanent injunction serves the public interest.................................................... 17

    III. The Court should grant Plaintiffs' proposed injunctive relief ......................................... 18

         A.  By setting forth specific criteria for equal access, the proposed order avoids any
              confusion as to how the Secretary must bring his website into compliance............... 18

         B.  Plaintiffs' proposed injunctive relief is necessary to ensure that compliance with
              Title II of the ADA is not ephemeral........................................................................ 19

CONCLUSION............................................................................................................................ 22

CERTIFICATE OF SERVICE ..................................................................................................... 24

i

# TABLE OF AUTHORITIES

**Cases**

*Am. Booksellers Found. for Free Expression v. Strickland*,
    512 F. Supp. 2d 1082 (S.D. Ohio 2007) ................................ 16

*Am. Civil Liberties Union of Kentucky v. McCreary Cty., Ky.*,
    607 F.3d 439 (6th Cir. 2010) ................................ 11

*Babcock v. Michigan*,
    812 F.3d 531 (6th Cir. 2016) ................................ 12

*Brinkman v. Budish*,
    692 F. Supp. 2d 855 (S.D. Ohio 2010) ................................ 16

*CSX Transp., Inc. v. Tennessee State Bd. of Equalization*,
    964 F.2d 548 (6th Cir. 1992) ................................ 15

*Deck v. City of Toledo*,
    29 F. Supp. 2d 431 (N.D. Ohio 1998) ................................ 17

*eBay Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006) ................................ 11

*EEOC v. Chrysler Corp.*,
    733 F.2d 1183 (6th Cir. 1984) ................................ 15

*Helen L. v. DiDario*,
    46 F.3d 325 (3d Cir. 1995) ................................ 12

*Jones v. City of Monroe, MI*,
    341 F.3d 474 (6th Cir. 2003) ................................ 12-13, 17

*Lewis v. Humboldt Acquisition Corp.*,
    681 F.3d 312 (6th Cir. 2012) ................................ 13, 17

*Marcus v. Kansas Dep't of Revenue*,
    170 F.3d 1305 (10th Cir. 1999) ................................ 12

*Martin v. Metro. Atlanta Rapid Transit Auth.*,
    225 F. Supp. 2d 1362 (N.D. Ga. 2002) ................................ 14

*Nat'l Fed. of the Blind v. Lamone*,
    No. 14-1631, 2014 WL 4388342 (D. Md. Sept. 4, 2014) ................................ 16

*Obama for Am. v. Husted,*
    697 F.3d 423 (6th Cir. 2012) ................................................................. 18

*Olmstead v. L.C.,*
    527 U.S. 581 (1999) ............................................................................... 12

*Sambo's of Ohio, Inc. v. City Council of City of Toledo,*
    466 F. Supp. 177 (N.D. Ohio 1979)........................................................ 16

*Sellers v. University of Rio Grande,*
    838 F. Supp. 2d 677 (S.D. Ohio 2012) ................................................... 15

*Silver Sage Partners, Ltd. v. City of Desert Hot Springs,*
    251 F.3d 814 (9th Cir. 2001) ................................................................. 15

*Tennessee v. Lane,*
    541 U.S. 509 (2004).............................................................................. 17

*United Steel, Paper & Forestry v. Kelsey-Hayes Co.,*
    750 F.3d 546 (6th Cir. 2014) ................................................................ 11

**Statutes**

42 U.S.C. § 12102 ......................................................................................... 13

42 U.S.C. § 12131(1)(B) ............................................................................... 12

42 U.S.C. § 12132 ......................................................................................... 12

42 U.S.C. § 12188(a)(2) ................................................................................ 15

42 U.S.C. §§ 12101-12213 ............................................................................. 1

Ohio Rev. Code. § 3503.20............................................................................. 3

**Regulations**

28 C.F.R. § 35.130 .................................................................................. 12, 14

28 C.F.R. § 35.160 .................................................................................. 12, 14

**Other Authorities**

ACLU and Center for Accessible Technology,
    *Access Denied: Barriers to Online Voter Registration for Citizens with Disabilities available at* https://www.aclu.org/report/access-denied-barriers-online-voter-registration-citizens-disabilities ......................................................................................... 3

Nondiscrimination on the Basis of Disability; Accessibility of Web Information and Services

of State and Local Government Entities and Public Accommodations,
  75 Fed. Reg. 43460, (proposed July 26, 2010) available at
  http://www.gpo.gov/fdsys/pkg/FR-2010-07-26/pdf/2010-18334.pdf .................................... 13

*Ohio Secretary of State Jon Husted's Biography*,
  Jon Husted, Ohio Secretary of State,
  http://www.sos.state.oh.us/SOS/agency/Biography.aspx ...................................... 17

*Settlement Agreement Between the United States of America and Champaign County, Illinois*,
  DJ No. 204-24-116 (July 20, 2015), *available at*
  https://www.ada.gov/champaign_pca/champaign_sa.html ...................................... 4

*Settlement Agreement Between the United States of America and Chaves County, New Mexico*,
  DJ No. 204-49-85 (May 12, 2015), *available at*
  https://www.ada.gov/chaves_county_pca/chaves_sa.html ...................................... 4

*Settlement Agreement Between the United States of America and Louisiana Tech University
and the Board of Supervisors for the University of Louisiana System*,
  DJ No. 204-33-116 (July 22, 2013), *available at*
  https://www.ada.gov/louisiana-tech.htm (WCAG 2.0 AA cited in Exhibit 1) ........................ 4

*Settlement Agreement Between the United States of America and Lumpkin County, Georgia*,
  DJ No. 204-19-227 (undated), *available at*
  https://www.ada.gov/lumpkin_co_pca/lumpkin_sa.html ...................................... 4

*Settlement Agreement Between the United States of America and Madison County, New York*,
  DJ No. 204-50-256 (undated), *available at*
  https://www.ada.gov/madison_co_ny_pca/madison_co_ny_sa.html ...................................... 5

*Settlement Agreement Between the United States of America and Merced County, California*,
  DJ No. 204-11E-383 (July 20, 2015), *available at*
  https://www.ada.gov/merced_co/merced_sa.html .................................................. 4

*Settlement Agreement Between the United States of America and Nueces County, Texas*,
  DJ No. 204-74-348 (Jan. 30, 2015), *available at*
  https://www.ada.gov/nueces_co_tx_pca/nueces_co_tx_sa.html ................................ 4

*Settlement Agreement Between the United States of America and Pennington County, South
Dakota*, DJ No. 204-69-49 (June 1, 2015), *available at*
  https://www.ada.gov/pennington_co/pennington_sa.html...................................... 4

*Settlement Agreement Between the United States of America and Robeson County, North
Carolina*, DJ No. 204-54-122 (July 29, 2015), *available at*
  https://www.ada.gov/robeson_co_pca/robeson_sa.html.......................................... 4

*Settlement Agreement Between the United States of America and the City of Cedar Rapids, Iowa*, DJ No. 204-27-41 (Sept. 1, 2015), *available at* https://www.ada.gov/cedar_rapids_pca/cedar_rapids_sa.html ................................................. 4

*Settlement Agreement Between the United States of America and the Orange County Clerk of Courts*, DJ No. 204-17M-440 (July 17, 2014), *available at* https://www.ada.gov/occ.htm ................................................................................................ 4

*Settlement Agreement Between the United States of America and Yakima County, Washington*, DJ No. 204-82-269 (July 20, 2015), *available at* https://www.ada.gov/yakima_co_pca/yakima_sa.html ........................................................... 4

Plaintiffs seek to enjoin Jon A. Husted, in his official capacity as Ohio Secretary of State, from denying individuals with disabilities an equal opportunity to access the Secretary of State's voter services website, in violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12213.

Plaintiffs' claim that Defendant violates the ADA by denying them equal access to the Secretary of State's website, a program or activity of the State, is meritorious. Without full access to Secretary Husted's website, Plaintiffs are denied an equal opportunity to (1) stay informed about the voting process; and (2) obtain, complete, and submit required forms. Because it is neither difficult nor expensive to make the voter services website accessible and maintain its accessibility, Secretary Husted cannot prove the affirmative defense of undue burden. Nor can Secretary Husted prove that making and keeping the website accessible would fundamentally alter the nature of the website.

This deprivation of Plaintiffs' civil rights causes them irreparable harm because it limits their access to critical voting information and forms. Conversely, although correcting the website in advance of the May 2017 primary election and implementing policies and procedures to maintain website accessibility requires some effort by the Secretary, Plaintiffs' requested relief will not create a hardship or jeopardize the operation of the website. Thus, the balance of hardships tips decidedly in Plaintiffs' favor. Additionally, enforcing the ADA's goal of ensuring equal opportunities for individuals with disabilities to participate in civic life and exercise their fundamental right to vote through an injunction serves the public interest.

Accordingly, this Court should issue an injunction requiring Secretary Husted to: (1) make his website accessible to Plaintiffs, such that the website offers Plaintiffs all of the same information and the same transactions, with substantially equivalent ease of use, by March 3,

2017 (60 days before the May 2, 2017 primary election); and (2) develop and implement policies and procedures to ensure that his website remains accessible after March 3, 2017.

## STATEMENT OF FACTS

Mr. Husted's office operates a website, www.sos.state.oh.us, that offers Ohio voters extensive information about voting procedures and policies, candidates, new voting initiatives, election results and data, campaign finance information, and upcoming elections.[1]  The website also provides voters with publications and forms, including the Voter Registration and Absentee Ballot Request forms and the Voter Access Guide, Voter Registration Instructions, and Guide to Voting in Ohio publications.  *See Elections/Voters/Candidates Publications*, Jon Husted, Ohio Secretary of State, http://www.sos.state.oh.us/SOS/publications.aspx#Elections (last visited Oct. 31, 2016).  Voters who wish to change their voter registration information can do so online using the website.  *See Update Your Voter Registration Information*, Jon Husted, Ohio Secretary of

---

[1] Although Secretary Husted's website includes information and services unrelated to voting or elections, Plaintiffs seek to access the entire website for two reasons.  First, to access the voting-related portions of the website, most users will first visit the website's homepage, which is not dedicated solely to elections information.  If the homepage is not accessible, Plaintiffs will have great difficulty navigating to the information they need related to voting in other sections of the website. *See, e.g.*, Ex. 1, Supp. Decl. of Sharron Rush ¶ 15 & Ex. 1-A, Nov. 16, 2015 ("Supp. Rush Decl.").    Second, information about voting and elections is scattered throughout the website.  For example, press releases relating to elections appear in a separate "Media" tab that is distinct from the "Elections & Voting," "Campaign Finance," and "Legislation & Ballot Issues" tabs, all of which are separate portions of the website that relate to elections and voting.  *See* http://www.sos.state.oh.us/SOS/mediaCenter/2016.aspx  (last visited Oct. 31, 2016).  Similarly, to learn about Secretary Husted's new initiatives with respect to elections and voting, users must visit the "Secretary Husted & the Office" tab and click on "Office Initiatives."  *See* http://www.sos.state.oh.us/SOS/agency/initiatives.aspx  (last visited Oct. 31, 2016).    Thus, although the "Media" and "Secretary Husted & the Office" tabs would appear to be unrelated to voting and elections, both sections contain information pertinent to Ohio voters.  Accordingly, to avoid a piecemeal approach to website remediation that inadvertently leaves portions of the website to which Ohio voters need access inaccessible, the Secretary must ensure the accessibility of his entire website.  This is consistent with Secretary Husted's obligation under Tile II to make all of his office's programs and activities fully accessible, including his website, which requires consistent policies and procedures across the board.

2

State, https://olvr.sos.state.oh.us/ovru/Modify.aspx (last visited Oct. 31, 2016). Beginning in January 2017, prospective voters will also be able to use the website to register to vote. *See* Ohio Rev. Code. § 3503.20.

## I.      Barriers to Website Access

Plaintiffs and other blind individuals rely on screen access software to receive textual information on a computer, tablet, or smartphone screen via an audio output, refreshable Braille display pad, or by screen magnification. When a website is built in compliance with current accessibility guidelines, screen access software allows Plaintiffs to have equal access to the information and forms that are publicly available on any website. Unfortunately, the Secretary has not built his website in compliance with those standards.

In February 2015, the ACLU and Center for Accessible Technology published a report, *Access Denied: Barriers to Online Voter Registration for Citizens with Disabilities*,[2] explaining the need for accessible online voter registration for voters with disabilities and assessing the accessibility of several states' voter services websites. *See* ECF No. 2-9, Decl. of Sharron Rush ¶ 10, Ex. B, Dec. 7, 2015 ("12/7/15 Rush Decl."). The report included an assessment of Ohio's voter services website and found that Ohio's website failed in seven out of nine categories of accessibility: forms; screen reader access; semantic organization; skip navigation; alt text; keyboard access; and text size and scaling. *Id.*, Ex. B at 46-47.

Sharron Rush, Executive Director of Knowbility, Inc., a nonprofit organization that is a leader in advocacy and training for web and digital technology accessibility, and an expert in accessible technology, reviewed the ACLU and Center for Accessible Technology's report and conducted her own testing of Ohio's website to determine if it was accessible to blind individuals

---

[2]   *available at* https://www.aclu.org/report/access-denied-barriers-online-voter-registration-citizens-disabilities.

using screen access software.  *Id.* ¶¶ 3, 4, 7, 8, 10.  The standard she uses for her website testing, including her testing of the Secretary's website, is the Web Content Accessibility Guidelines ("WCAG") version 2.0 level AA, which is the de facto accepted industry standard for web accessibility.[3]  *See* 12/7/15 Rush Decl. ¶ 9. Each of the violations of the WCAG 2.0 AA standard described below is, independent of the standard, a barrier to access for blind users of the website.

Ms. Rush's initial testing of the website found many of the same problems identified in the ACLU and Center for Accessible Technology's report.  *Id.* ¶ 10.  In particular, she found that

---

[3] The U.S. Department of Justice has required compliance with the WCAG 2.0 AA standard in its settlement agreements under Title II of the ADA.  *See, e.g.*, *Settlement Agreement Between the United States of America and the City of Cedar Rapids, Iowa*, DJ No. 204-27-41 (Sept. 1, 2015), *available at* https://www.ada.gov/cedar_rapids_pca/cedar_rapids_sa.html; *Settlement Agreement Between the United States of America and Robeson County, North Carolina*, DJ No. 204-54-122 (July 29, 2015), *available at* https://www.ada.gov/robeson_co_pca/robeson_sa.html; *Settlement Agreement Between the United States of America and Champaign County, Illinois*, DJ No. 204-24-116 (July 20, 2015), *available at* https://www.ada.gov/champaign_pca/champaign_sa.html; *Settlement Agreement Between the United States of America and Merced County, California*, DJ No. 204-11E-383 (July 20, 2015), *available at* https://www.ada.gov/merced_co/merced_sa.html; *Settlement Agreement Between the United States of America and Yakima County, Washington*, DJ No. 204-82-269 (July 20, 2015), *available at* https://www.ada.gov/yakima_co_pca/yakima_sa.html; *Settlement Agreement Between the United States of America and Pennington County, South Dakota*, DJ No. 204-69-49 (June 1, 2015), *available at* https://www.ada.gov/pennington_co/pennington_sa.html; *Settlement Agreement Between the United States of America and Chaves County, New Mexico*, DJ No. 204-49-85 (May 12, 2015), *available at* https://www.ada.gov/chaves_county_pca/chaves_sa.html; *Settlement Agreement Between the United States of America and Nueces County, Texas*, DJ No. 204-74-348 (Jan. 30, 2015), *available at* https://www.ada.gov/nueces_co_tx_pca/nueces_co_tx_sa.html; *Settlement Agreement Between the United States of America and the Orange County Clerk of Courts*, DJ No. 204-17M-440 (July 17, 2014), *available at* https://www.ada.gov/occ.htm; *Settlement Agreement Between the United States of America and Louisiana Tech University and the Board of Supervisors for the University of Louisiana System,* DJ No. 204-33-116 (July 22, 2013), *available at* https://www.ada.gov/louisiana-tech.htm (WCAG 2.0 AA cited in Exhibit 1); *Settlement Agreement Between the United States of America and Lumpkin County, Georgia*, DJ No. 204-19-227 (undated), *available at* https://www.ada.gov/lumpkin_co_pca/lumpkin_sa.html; *Settlement Agreement Between the United States of America and Madison County, New York*, DJ No. 204-50-256 (undated), *available at* https://www.ada.gov/madison_co_ny_pca/madison_co_ny_sa.html.

the website used many graphics that are not properly labeled, rendering them incomprehensible to a screen reader. *Id.* ¶ 7. She also found that the website lacked a heading structure that would enable a screen reader to move efficiently within the page and had improperly designed menus that could not be expanded using screen access software. *Id.* These issues created an incomprehensible experience for a blind user attempting to navigate through the website using screen access software. *Id.* Ms. Rush also found that the website had various items on its pages improperly ordered, causing a screen reader user to jump to different parts of a given page when trying to read through the page from top to bottom. *Id.*

Ms. Rush also assessed two of the forms on the voter services website: (1) the Voter Registration and Information Update Form (http://www.sos.state.oh.us/sos/upload/elections/forms/4010.pdf); and (2) the Application for Absentee Voter's Ballot (http://www.sos.state.oh.us/sos/upload/elections/forms/11-A.pdf). *Id.* ¶ 8. She found multiple problems with each form that made it exceedingly difficult for blind individuals using screen access software to access and process the forms' content, and, in the case of the absentee ballot application, made it impossible for a blind individual to complete the form independently. *Id.* Ms. Rush opined that it would cost between $25,000 to $50,000 to fix the Secretary's website, including all of its forms, and that creating a new website could be considerably less expensive. 12/7/15 Rush Decl. ¶ 11.

On December 15, 2015, the Secretary's office entered into an agreement with a web services vendor "to undergo an ADA compliance remediation to the voting and elections portions of the website." Def.'s Opp'n to Pls.' 4/8/16 Perm. Inj. Mot. at 11, ECF No. 29. The anticipated end date of the remediation was January 7, 2016. ECF No. 29-2, p. 25. Nevertheless, when Ms. Rush retested the voting and elections portions of the Secretary's

5

website on February 17, 2016, she found that the website still had several WCAG 2.0 AA violations. Supp. Rush Decl. ¶ 6. After the Secretary made additional changes to the website, Ms. Rush reviewed the website again on February 29, 2016, only to discover that the site not only continued to violate several of the WCAG 2.0 AA standards, but now had additional violations that represented new barriers for blind individuals. *Id.* ¶ 7.

In its April 25, 2016 memorandum in opposition to Plaintiffs' first permanent injunction motion, the Secretary stated that a consultant would provide a written accessibility assessment of his website, with the corrective actions needed to satisfy WCAG 2.0 AA, by September 2016 and that "[a]s soon as practical after receipt of the assessment, the Secretary's office w[ould] retain an independent consultant with experience related to accessible website development to incorporate the recommendations into the Secretary's website." Def.'s Opp'n to Pls.' 4/8/16 Perm. Inj. Mot. at 11-12, ECF No. 29. Nevertheless, as of the date of this filing, barriers to access persist throughout the Secretary of State's website.

As the November presidential election drew closer, Plaintiffs asked the Secretary to prioritize remediating three electronic forms related to voter registration and requesting an absentee ballot. The Secretary's office accepted this request and attempted to make all three forms accessible, but still failed to remediate all of the WCAG violations in its initial attempt. Supp. Rush Decl. ¶ 8. Ms. Rush reviewed the forms and provided additional feedback about the existing barriers and how to correct them. *Id.* Following this additional guidance from Plaintiffs, by the end of September 2016, the Secretary had corrected two of the forms, but one form still contained a WCAG violation. *Id.* ¶ 9.

Ms. Rush has reviewed the findings that SSB Bart Group, the web accessibility consultant the Secretary hired to assess his website, prepared in August 2016 after testing the

website.  *Id.* ¶ 10.  In early November 2016, Ms. Rush conducted additional accessibility testing of the Secretary of State's entire website.  *Id*.  This subsequent review of the website revealed that the website continues to violate several important WCAG criteria.  *Id.* ¶¶ 10-12.  The following chart summarizes the top WCAG violations revealed in the SSB Bart audit, along with their prevalence throughout the website:

| Issue: | Error Rate |
| --- | --- |
| Ensure images provide informative alternative text | 69% |
| Provide a valid label for form fields | 48% |
| Text alternatives for CSS background images that convey meaning | 76% |
| Provide a mechanism for skipping past repetitive navigation links | 66% |
| Ensure image buttons provide alternative text | 17% |
| Ensure keyboard focus is indicated visually | 66% |

*Id.* ¶ 11.

To demonstrate the ways in which the current website continues to pose barriers for blind screen reader users, Ms. Rush's colleague at Knowbility, Jessica Looney, recorded another colleague, Desiree Sturdevant, a blind screen reader user, attempting to access various portions of the Secretary's website.  *Id.* ¶ 14, Ex. 1-A.  On the video, Ms. Sturdevant attempts to access the Secretary of State's homepage to learn about voter registration.  *Id.* ¶ 15, Ex. 1-A.  As she attempts to explore the homepage, she finds that she cannot navigate to other sections of the website through the normal navigational links on the homepage.  *Id.*  Many of the links are undefined and/or can only be accessed with the click of a mouse, rather than with a keyboard, which is what blind people use to navigate and click through to new links.  *Id.*  Although a sighted visitor to the homepage can view the various navigation options on the rotating image carousel and click through to follow a link, this image carousel is not readable or comprehensible for blind screen reader users, creating a significant barrier.  *Id.*  When Ms. Sturdevant notes on

the video that the homepage's links are "clickable" functions that she cannot activate, this is the problem to which she refers. *Id.* In addition, because the navigation menu on the homepage is not accessible, Ms. Sturdevant cannot independently navigate to the "media" or "businesses" sections of the website due to lack of keyboard accessibility. *Id.* When she tries to use her screen reader to pull the navigation links from the homepage into a list she can access, she finds that the links themselves are not named in a way that allows a screen reader user to understand what the link is and where it goes. *Id.*

Ms. Sturdevant next explores the Media section of the website—arriving there with the assistance of a sighted third party, since she cannot navigate to this section independently from the homepage. *Id.* ¶ 16, Ex. 1-A. She confronts further barriers in this section. *Id.* The tools she uses to quickly navigate through a web page to learn about the content and structure of page, such as form fields lists and links lists, are unworkable because the fields and links are not coded properly. *Id.* For example, instead of learning what all of the links on the page are and where they lead, the links are announced only as "click" or "click here" with no information indicating where Ms. Sturdevant would go if she were to click on that link. *Id.*

This section also has many images that do not contain alternative text (or "alt text") describing what they are. *Id.* ¶ 17, Ex. 1-A. A November 1, 2016 press release in the Media section entitled "Election Day is One Week Away,"[4] illustrates a severe example of this problem. This press release provides critical information to voters about the coming election, including voting times and dates. Yet much of the information in the press release is contained in two images, which do not have alt text conveying the information. *Id.* ¶ 17. The dates for early voting, for example, are only conveyed through the image of the calendar. Thus, this

---

[4] https://www.sos.state.oh.us/sos/mediaCenter/2016/2016-11-01-a.aspx (last visited Nov. 15, 2016).

important information is not available to blind voters. *Id.* In the video, as Ms. Sturdevant continues to navigate through the Secretary's website and search for information, she encounters additional barriers, as described further in Ms. Rush's supplemental declaration. *Id.* ¶ 18, Ex. 1-A. As the video reveals, almost a year after the filing of this lawsuit, the Secretary's website still fails to offer blind individuals using screen access software all of the same information and the same transactions, with substantially equivalent ease of use, as it offers to sighted users. *Id.* ¶ 11-18.

## II. Lack of Policies and Procedures to Ensure Website Accessibility

As Ms. Rush explains in her supplemental declaration, the Secretary's scattered efforts to remediate only certain portions of his website over the past year have produced a continued failure to create and maintain an accessible website. *Id.* ¶ 19. This piecemeal approach to accessibility has largely only complicated and exacerbated accessibility problems. *Id.* ¶¶ 19-21. Just like building a fully wheelchair accessible building interior that can only be reached by climbing a staircase accomplishes little to expand access to the building, so, too, does a piecemeal approach to remediating a website. *Id.* ¶ 21. The problem with a website, however, is even more severe because of its dynamic and ever-changing nature. *Id.* ¶ 22. Without standards, training, policies, and procedures addressed to maintaining web accessibility, any fix would be chimerical, lasting only until the next new image, press release, or data is added to the website. *Id.*

To maintain web accessibility, therefore, organizations like the Secretary of State's office must have policies and procedures that create an internal culture of accessibility and accountability. *Id.* The Web Accessibility Initiative (WAI) of the W3C, the global standards making body for the Web, recommends the following stages of policies and procedures to create a successful web accessibility improvement program:

9

a.   Initiate -  Develop organizational understanding of accessibility;

b.   Plan - Develop clear and measurable accessibility goals and an environment that

supports accessibility;

c.   Implement - Ensure personnel are trained, tools are available, and accessibility is

included throughout the project development life cycle; and

d.   Sustain – Iteratively review and improve content, process, and resources.

*Id.* ¶ 23.

Yet such a holistic accessibility program is wholly absent from the Secretary's office.

Ms. Rush observes that "the Secretary's commitment to accessibility, if one indeed exists, is not

explicitly stated in policy; it is not communicated to technical staff in an actionable way; it is not

supported in style guides and code pattern libraries; it is not part of the training given to

designers and developers; it is not part of the requirements for third-party software acquisitions

or procurement of technical services; and it is not part of the quality assurance, testing, and

validation process."  *Id.* ¶ 19.

Hollie Elam LaMar, whom the Secretary identified as an individual knowledgeable about

his office's website, testified at her deposition in April 2016 that the Secretary of State's office

has no official policies regarding website accessibility.  Ex. 2, Dep. of Hollie Elam LaMar 8:2-7,

50:7-51:11 (hereinafter "LaMar Dep.").  Although Ms. LaMar created a "best practices cheat

sheet" following the present litigation, this sheet is only used by her internal Public Affairs team,

has not been approved by anyone else within the Secretary's office, and is silent on how it is to

be implemented throughout the office.  *Id.* 50:7-52:12.  Ms. Rush reviewed Ms. LaMar's sheet

and observed that the document is entirely inadequate to meet accessibility standards and lacks

any mechanism for implementation, quality assurance, or measurable outcomes.  Supp. Rush

Decl. ¶ 28, Ex. 1-B.

Ms. LaMar further testified that the Secretary's office lacks "any sort of policy or protocol for testing updates to the website to ensure accessibility."  LaMar Dep. 52:24-53:4.  Nor does the office have a written policy regarding how to handle and prioritize complaints about the website.  *Id.* 57:17-24.  Ms. LaMar further admitted that no one on her team tests for website accessibility using screen reading software.  *Id.* 58:15-21.

## LEGAL STANDARD

The standards for a permanent injunction and preliminary injunction are essentially the same, except that rather than show a likelihood of success on the merits, Plaintiffs must actually succeed on the merits of their claim.  *Am. Civil Liberties Union of Kentucky v. McCreary Cty., Ky.*, 607 F.3d 439, 445 (6th Cir. 2010).  To obtain a permanent injunction, Plaintiffs must establish:

> (1) that [they have] suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff[s] and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*United Steel, Paper & Forestry v. Kelsey-Hayes Co.*, 750 F.3d 546, 559 (6th Cir. 2014), *reh'g granted and opinion vacated on different grounds*, 795 F.3d 525 (6th Cir. 2015) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

## ARGUMENT

**I.     By denying Plaintiffs an equal opportunity to access his website, Secretary Husted violates Title II of the ADA.**

Secretary Husted's failure to provide blind voters equivalent access to his website violates Title II of the ADA, which requires that "[n]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the

11

services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Defendant is a public entity within the scope of Title II. 42 U.S.C. § 12131(1)(B).

In providing a website service, Secretary Husted must afford Plaintiffs "an opportunity to participate in or benefit from the aid, benefit, or service that is . . . equal to that afforded others." 28 C.F.R. § 35.130(b)(1)(ii). [5] Indeed, Secretary Husted must provide Plaintiffs an aid, benefit, or service that is "as effective in affording equal opportunity" as is provided to others. 28 C.F.R. § 35.130(b)(1)(iii).

Public entities are also required to provide "appropriate auxiliary aids and services where necessary to afford individuals with disabilities . . . an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity." 28 C.F.R. § 35.160(b)(1). The aids and services must be provided to "protect the privacy and independence of the individual with a disability." 28 C.F.R. § 35.160(b)(2). Therefore, the Secretary must provide Plaintiffs an opportunity to participate in and benefit from his website that is equal to and as effective as that afforded to individuals without disabilities.

To prove a violation of the ADA, Plaintiffs must establish that: (1) they have disabilities; (2) they are otherwise qualified to receive the benefits of the public service, program, or activity at issue; and (3) they were excluded from participation in or denied the benefits of such service,

---

[5] The regulations implementing Title II of the ADA "carry the force of law" because Congress required the Department of Justice to model these regulations after the existing Section 504 regulations. *Helen L. v. DiDario*, 46 F.3d 325, 332 (3d Cir. 1995); *see Marcus v. Kansas Dep't of Revenue*, 170 F.3d 1305, 1307 n.1 (10th Cir. 1999); *accord Babcock v. Michigan*, 812 F.3d 531, 543 (6th Cir. 2016) (noting that the Title II regulations are entitled to "controlling weight" and relying on the regulations to determine the scope of the ADA's language). At the very least, the Supreme Court has stated that the Title II ADA regulations "warrant respect" and that "the well-reasoned views of the agencies implementing a statute constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Olmstead v. L.C.*, 527 U.S. 581, 597-98 (1999) (internal quotation marks omitted).

program, or activity, or otherwise discriminated against, on the basis of their disabilities.  *Jones v. City of Monroe, MI*, 341 F.3d 474, 477 (6th Cir. 2003), *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 317 (6th Cir. 2012) (en banc).  Plaintiffs easily establish the first and second prongs.  Because they are blind, Ms. Hindel, Ms. Pierce, Ms. Denning, and other NFB members all have a physical impairment "that substantially limits [the] . . . major life activit[y]" of seeing and thus have a "disability" under the ADA.  42 U.S.C. § 12102; ; Decl. of Marianne Denning ¶ 3, Dec. 4, 2015, ECF No. 2-2 ("Denning Decl."); Decl. of Shelbi Hindel ¶ 3, Dec. 4, 2015, ECF No. 2-6 ("Hindel Decl."); Decl. of Barbara Pierce ¶ 3, Dec. 4, 2015, ECF No. 2-7 ("Pierce Decl."); Decl. of Mark Riccobono ¶ 4, Dec. 7, 2015, ECF No. 2-8 ("Riccobono Decl.").  Furthermore, because Ms. Hindel, Ms. Pierce, Ms. Denning, and many other NFB members are registered to vote in Ohio, or are otherwise interested in voting and elections in Ohio, they are eligible and thus "qualified" to receive the benefits of using the Secretary's website to access information and complete forms in advance of the May 2017 primary election.  Denning Decl. ¶ 4; Hindel Decl. ¶ 4; Pierce Decl. ¶ 4; Riccobono Decl. ¶ 8.

Plaintiffs satisfy the third element of their claim as well.  Secretary Husted's voter services website is a program, service, or activity of the state to which Plaintiffs must have access.  *See Martin v. Metro. Atlanta Rapid Transit Auth.*, 225 F. Supp. 2d 1362, 1377 (N.D. Ga. 2002) (holding that public transit agency violated Title II of the ADA by maintaining an inaccessible website); Nondiscrimination on the Basis of Disability; Accessibility of Web Information and Services of State and Local Government Entities and Public Accommodations, 75 Fed. Reg. 43460, 43464 (proposed July 26, 2010)[6] ("There is no doubt that Web sites of state and local government entities are covered by title II of the ADA").  Yet Ms. Hindel, Ms. Pierce,

---

[6] *Available at* http://www.gpo.gov/fdsys/pkg/FR-2010-07-26/pdf/2010-18334.pdf.

Ms. Denning, and many NFB members have been denied the right to use the Secretary's website in a manner that is "equal to that afforded others."  28 C.F.R. § 35.130(b)(1)(ii).

The website's valuable information and critical services are not fully and readily available to blind Ohio voters and prospective voters.  For Plaintiffs and other blind individuals who use screen access software to navigate, review, and interact with websites, the Secretary of State's website is difficult to navigate and contains sections that are totally unreadable.  Supp. Rush Decl. ¶¶ 9-18.  Because Secretary Husted makes the information and services on his website instantaneously available to individuals without disabilities, at whatever time they choose to access them, he must provide individuals with disabilities an equal opportunity to access the information and services they need, whenever they may need them – even though some may be available through other means.  *See Martin*, 225 F. Supp. 2d at 1377 (holding that the public transit agency's website must be accessible, even though information could be requested in Braille and was also available by telephone).  Only by making the website accessible can the Secretary ensure that his "communications with applicants, participants, members of the public, and companions with disabilities are as effective as communications with others."  28 C.F.R § 35.160(a)(1).

Making the Secretary's website accessible would not constitute a fundamental alteration to the website because it would remain a fully operational website, simply one that more people could access.  Nor would correcting the website to be accessible impose an undue financial or administrative burden given that doing so would cost only $25,000 to $50,000.  12/7/15 Rush Decl. ¶ 11.  Adopting policies and procedures to maintain accessibility are similarly low-cost, particularly in comparison to unsuccessful piecemeal approaches to web accessibility.  Supp. Rush Decl. ¶ 30.

**II.    Plaintiffs satisfy all of the criteria for granting a permanent injunction.**

**A.    Plaintiffs have suffered and will continue to suffer an irreparable injury if Secretary Husted continues to violate their federal civil right to equal opportunity.**

The Court may presume irreparable harm when a defendant violates a civil rights statute such as the ADA.  *See Sellers v. Univ. of Rio Grande*, 838 F. Supp. 2d 677, 687 (S.D. Ohio 2012) (noting support for the proposition that "when Congress has enacted a statute such as the ADA to prohibit discrimination against individuals with disabilities, the occurrence of the very discrimination Congress sought to prevent is the type of irreparable injury that may support the issuance of an injunction").[7]  The Court may also presume irreparable harm where, as here, the statute explicitly provides for injunctive relief.  *See* 42 U.S.C. § 12188(a)(2) ("Where appropriate, injunctive relief shall also include requiring the provision of an auxiliary aid or service, modification of a policy, or provision of alternative methods, to the extent required by this subchapter."); *CSX Transp., Inc. v. Tennessee State Bd. of Equalization*, 964 F.2d 548, 551 (6th Cir. 1992).

If the Court does not grant a permanent injunction requiring Secretary Husted to make his website accessible and adopt policies and procedures to maintain its accessibility, Plaintiffs will be denied access to information about the May 2017 primary election, voting, and future elections.  Without an equal opportunity to access critical information about voting and elections, blind Ohio voters cannot engage in the voting process on equal footing and will therefore be irreparably harmed.

---

[7] *See also Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 827 (9th Cir. 2001) ("[W]here a defendant has violated a civil rights statute, we will presume that the plaintiff has suffered irreparable injury from the fact of the defendant's violation"); *EEOC v. Chrysler Corp.*, 733 F.2d 1183, 1186 (6th Cir. 1984) (holding that the injuries facing the plaintiffs, such as loss of work, loss of future prospects for work, and infliction of emotional harm, were the type of injuries Congress sought to avoid through the ADEA and thus constituted irreparable harm).

**B.      Remedies available at law, such as monetary damages, are inadequate to compensate for Plaintiffs' injury.**

No amount of monetary relief can compensate for being denied the critical information and resources on Secretary Husted's website. "Remedies available at law are inadequate to compensate for violation of an individual's civil rights." *National Federation of the Blind v. Lamone*, No. 14-1631, 2014 WL 4388342, at *15 (D. Md. Sept. 4, 2014); *accord Brinkman v. Budish*, 692 F. Supp. 2d 855, 866 (S.D. Ohio 2010); *Am. Booksellers Found. for Free Expression v. Strickland*, 512 F. Supp. 2d 1082, 1106 (S.D. Ohio 2007) *rev'd and remanded on alternative grounds*, 601 F.3d 622 (6th Cir. 2010); *Sambo's of Ohio, Inc. v. City Council of City of Toledo*, 466 F. Supp. 177, 181 (N.D. Ohio 1979). Thus, the only relief that will remedy Plaintiffs' injury is relief that will prevent its reoccurrence: an injunction requiring Secretary Husted to make his website available to Plaintiffs on equal terms and to adopt the measures necessary to maintain its accessibility.

**C.      The balance of hardships tips decidedly in favor of granting Plaintiffs' requested equitable relief.**

The balance of hardships tilts heavily in favor of granting Plaintiffs an injunction in this case. Unless Secretary Husted's website is corrected to work with screen access software in advance of the May 2017 primary election, Plaintiffs will be at a severe disadvantage when it comes to accessing information about key election dates, the candidates on the ballot, and their poll locations. Accordingly, in the absence of an injunction, Plaintiffs will continue to suffer the effects of discrimination and exclusion from one of the most important institutions in a democracy.

In contrast, Mr. Husted's office will suffer little to no harm if the Court grants Plaintiffs an injunction. Remediating the website so that it offers Plaintiffs all of the same information and the same transactions, with substantially equivalent ease of use, is not particularly costly.

12/7/15 Rush Decl. ¶ 11.  Similarly, adopting policies and procedures to ensure that the dynamic website remains accessible as new content is posted would cost little.  Supp. Rush Decl. ¶ 30.  In addition, because an injunction would further Secretary Husted's goals of "using technology to streamline the voting process," "improv[ing] how we run elections in Ohio," and providing "enhanced services to voters," the balance of hardships tips strongly in favor of granting Plaintiffs' requested relief.  *See Ohio Secretary of State Jon Husted's Biography*, Jon Husted, Ohio Secretary of State, http://www.sos.state.oh.us/SOS/agency/Biography.aspx (last visited Nov. 7, 2016).

> **D.      A permanent injunction serves the public interest.**

Congress has made clear in enacting the ADA that the public interest lies in the eradication of discrimination against persons with disabilities, declaring that the ADA's purpose is "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."  *Tennessee v. Lane*, 541 U.S. 509, 516 (2004) (quoting 42 U.S.C. § 12101(b)(1)).  In the context of injunctions, the Sixth Circuit has firmly held that "[t]he public interest is clearly served by eliminating the discrimination Congress sought to prevent in passing the ADA."  *Jones*, 341 F.3d at 490, *abrogated on other grounds by Lewis*, 681 F.3d at 317; *accord Deck v. City of Toledo*, 29 F. Supp. 2d 431, 434 (N.D. Ohio 1998) (noting that "there is a significant public interest in eliminating discrimination against individuals with disabilities") (internal quotation marks omitted).

Furthermore, a permanent injunction in this case would ensure that more citizens have the opportunity to learn about the voting process in Ohio, thus promoting the fundamental right to vote.  As the Sixth Circuit has observed:

> [T]he public has a strong interest in exercising the fundamental political right to
> vote. That interest is best served by favoring enfranchisement and ensuring that

qualified voters' exercise of their right to vote is successful. The public interest therefore favors permitting as many qualified voters to vote as possible.

*Obama for Am. v. Husted*, 697 F.3d 423, 436-37 (6th Cir. 2012) (internal quotation marks and citations omitted).  Granting injunctive relief in this case promotes the right to vote, is consistent with the anti-discrimination mandate of the ADA, and thus serves the public interest.

**III.      The Court should grant Plaintiffs' proposed injunctive relief.**

Contemporaneous with the filing of the present motion, Plaintiffs have filed a proposed order that lays out the relief they seek in greater detail.  *See* Ex. 3, Proposed Order.  The proposed order has two main components.  First, it requires Defendant to make his website accessible and describes specific standards to which the website must conform to be accessible. Second, it sets forth the policies and procedures needed to maintain an accessible website.  Both components are critical to ensuring that Plaintiffs have an equal opportunity to access the Secretary's website in both the short and long term.

**A.      By setting forth specific criteria for equal access, the proposed order avoids any confusion as to how the Secretary must bring his website into compliance.**

Plaintiffs request that the Court order Defendant to make his website accessible to them so that the website offers Plaintiffs all of the same information and the same transactions, with substantially equivalent ease of use, by March 3, 2017.  To ensure that all parties understand what this type of website accessibility entails, Plaintiffs have specified two minimum requirements in their proposed order.  First, Defendant's website must conform to WCAG 2.0 AA, the de facto industry standard for web accessibility.  *See* 12/7/15 Rush Decl. ¶ 9; *see also supra* note 3.

Second, all electronic forms available on the Secretary's website must be electronically fillable, submissable, and savable, and be offered in a format that is accessible across a wide

spectrum of electronic devices, such as HTML. Because sighted individuals accessing the website can print forms and independently complete and submit them, and save a copy for their records if they wish, blind individuals must be able to do the same. By making online forms fillable, submissable, and, once completed, savable, on an electronic device, Plaintiffs using screen access software can do the same.

Because not all electronic formats are accessible across a spectrum of electronic devices, it is important to direct the Secretary to provide electronic forms only in formats that are. Portable Document Format ("PDF") forms, for example, do not render accessibility information on iOS (Apple device operating systems) or Android devices. Supp. Rush Decl. ¶ 13. Because so many individuals now use their phones and tablets to access the internet, and given their portability and ease of use, these devices are especially popular among blind individuals, it is critical that forms be accessible on these devices. *Id.* Fortunately, it is not difficult to create and make accessible forms available in formats such as HTML that are accessible across a wide range of electronic devices. *Id.* Thus, this Court should order Defendant to provide electronic forms in these formats.

The Court should order Defendant to meet these criteria for accessibility by March 3, 2017. March 3 is 60 days before the May 2, 2017 primary election. This will allow Plaintiffs time to access the website in advance of the election to learn about voter registration, request absentee ballots, and obtain other information pertinent to the election.

**B.  Plaintiffs' proposed injunctive relief is necessary to ensure that compliance with Title II of the ADA is not ephemeral.**

Websites are dynamic. As content is added or edited, a website can easily go from being accessible one day to inaccessible the next. Supp. Rush Decl. ¶ 22. Thus, it is not sufficient for Secretary Husted to make a one-time fix to his website or even to adopt a completely new,

accessible website.  Without policies and procedures in place to ensure that an accessible website remains accessible, equal access is fleeting.  *Id.*  Furthermore, given that the leadership of the Office of Secretary of State changes over time, policies and procedures are particularly critical to ensure that web accessibility is preserved at an institutional level.

Accordingly, Plaintiffs' proposed order includes detailed policies and procedures necessary to ensure accessibility in the long term.  These policies and procedures track the WAI's four-phased approach to developing and implementing a successful web accessibility improvement program (initiation, planning, implementation, and sustaining), *id.* ¶ 23, and are designed to create a culture within the Secretary's office that treats accessibility as a priority rather than an afterthought.

Thus, to initiate accessibility, Plaintiffs ask the Court to order the Secretary's office to adopt and disseminate a web accessibility policy to be approved by Plaintiffs and made publicly available through the homepage of the Secretary's website.  *Id.* ¶ 24.  The policy must address procurement of technical services and third-party software or web content to ensure that it is accessible.  *Id.*  All employees and contractors responsible for web content must receive a copy of the policy on an annual basis.

To plan for accessibility, which requires clear and measurable accessibility goals and a supportive environment, Plaintiffs' proposed order requires Defendant to designate an employee as a Web Accessibility Coordinator, who will report directly to the Assistant Secretary of State and be responsible for managing implementation of the Court's order.[8]  *Id.* ¶ 25.  The proposed order also requires creation of a cross-functional web accessibility committee that reports to the

---

[8] Although Plaintiffs understand that Secretary Husted may have hired an individual to oversee web accessibility efforts in his office, it is unclear what this new hire's responsibilities are, to whom he reports, and whether he receives the kind of institutional support needed to do his job effectively.

Web Accessibility Coordinator and will assist in maintaining the accessibility of the website.  *Id.*
Having the Web Accessibility Coordinator report to high-level staff and work with a cross-
functional committee helps ensure that the coordinator will be well integrated into the office and
thus more effective in her role.  *Id.*

      Implementation requires robust staff training, as well as performance reviews that
account for accessibility considerations.  *Id.* ¶ 26.  It also must entail responding appropriately
and timely to complaints regarding web accessibility.  *Id.*  Accordingly, the proposed order
establishes policies and procedures governing staff training, performance reviews, handling
phone calls regarding accessibility problems and how to prioritize and address bug fixes on the
website.

      Furthermore, to fully implement accessibility, the Secretary must be aware of
accessibility problems on an ongoing basis.  *Id.*  Under the proposed order, the Secretary would
retain a web accessibility consultant who would evaluate the website annually for five years and
submit a written report.  It also requires the Secretary to select an automated accessibility testing
tool to be used to test the website every three months for the next five years.  Because user
testing and feedback are critical in building and maintaining an accessible website, *see id.*, the
proposed order requires the Secretary to convene a group of individuals with disabilities who use
screen access software to test the website annually and upon any substantial changes for the next
five years.

      To sustain accessibility, the Secretary's office must be able to record and measure
progress in implementation.  *Id.* ¶ 27.  Thus, the proposed order requires the Web Accessibility
Coordinator to record on a quarterly basis certain metrics related to the office's maintenance of
an accessible website.  Including considerations of accessibility in performance reviews also

promotes this goal.  Because soliciting user feedback is also critical for sustaining accessibility, *id.*, the proposed order requires the Secretary to create a link on his homepage instructing users on how they can submit feedback related to accessibility, including through an accessible online form or email address and a toll-free number.

The proposed order includes provisions enabling Plaintiffs to monitor Defendant's progress in implementing the order and enforce the order if need be.  To that end, the order directs the Web Accessibility Coordinator to submit a report detailing compliance with the order on a six month basis.  The order creates a process for the parties to address and resolve any problems with compliance.  Plaintiffs' ongoing involvement is more practical than a court-ordered monitor, and will ensure that there is rich communication between the parties to prevent the need for further involvement by the Court.  The order includes a provision that prohibits Plaintiffs from unreasonably withholding approval.

Without these policies and procedures, it is all too likely that the Secretary will develop an accessible website, only to have it undone in a few months or years.  *Id.* ¶¶ 19-22.  Indeed, the Secretary's unsuccessful attempts to create an accessible website over the past year underscore the importance of institutionalizing accessibility so that one-time fixes are not quickly reversed. *Id.* ¶ 20.  Because it would be costly and inefficient for Plaintiffs to file a new complaint every time the website reverts back to hosting inaccessible content, the Court should require Defendant to adopt the policies and procedures outlined in the proposed order to ensure that the Secretary's website remains accessible in the long term.

## **CONCLUSION**

Secretary Husted's failure to provide Plaintiffs equivalent access to his website violates Title II of the ADA and the balance of the four factors for issuing a permanent injunction weigh

heavily in Plaintiffs' favor.  For the foregoing reasons, Plaintiffs respectfully request that the Court grant their Motion for Permanent Injunction and order Secretary Husted to: (1) make his website, http://www.sos.state.oh.us, accessible to Plaintiffs, such that the website offers Plaintiffs all of the same information and the same transactions, with substantially equivalent ease of use, by March 3, 2017 (60 days before the May 2, 2017 primary election); and (2) develop and implement policies and procedures to ensure that his website remains accessible after March 3, 2017.

Respectfully submitted,

_____/s/_____
Jason Boylan (0082409)
Trial Attorney
Kristen Henry (0082382)
DISABILITY RIGHTS OHIO
Ohio Disability Rights Law and Policy Center, Inc.
50 W. Broad St., Suite 1400
Columbus, Ohio  43215
Tel:  (614) 466-7264
Fax:  (614) 644-1888
jboylan@disabilityrightsohio.org
khenry@disabilityrightsohio.org

Daniel F. Goldstein (admitted *pro hac vice*)
Jessica P. Weber (admitted *pro hac vice*)
BROWN, GOLDSTEIN & LEVY LLP
120 E. Baltimore Street, Suite 1700
Baltimore, Maryland  21202
Tel:  (410) 962-1030
Fax:  (410) 385-0869
dfg@browngold.com
jweber@browngold.com

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this <u>16th</u> day of <u>November</u>, 2016, a copy of the foregoing

Motion for Permanent Injunction was served on all counsel of record via the Court's electronic

filing system.

_____/s/_____

Jessica P. Weber
